Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
T: (510) 725-3000
shanas@hbsslaw.com

Additional counsel listed on signature page

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANET WOODWARD, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| META PLATFORMS, INC. and GOOGLE, LLC | **JURY TRIAL DEMANDED** |
| Defendants. | |

CLASS ACTION COMPLAINT                                      Case No.

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................3

III. PARTIES .................................................................................................................4

    A.   Plaintiff. ......................................................................................................4

    B.   Defendants and Their Business...................................................................5

        1.   Meta Products, Inc. .........................................................................5

        2.   Google, LLC ...................................................................................7

IV.  FACTUAL ALLEGATIONS ...................................................................................7

    A.   Background. .................................................................................................7

    B.   Security Researchers Uncovered A Massive Privacy Invasion By
        Meta. .........................................................................................................10

    C.   Meta Collected Users Private, Personal Information By Misusing
        Localhost Sockets. ....................................................................................10

    D.   The Wide Ranging Scope of Defendant's Scheme Permitted It To
        Obtain Private Information from Millions of Android Owners via
        Millions of Websites. .................................................................................15

    E.   Defendant's Covert Web-to-App Tracking Scheme Began No
        Later Than September 2024.......................................................................17

    F.   Researchers Disclose Their Findings, Meta Largely Stops Using
        the Technique and Google Blocks It..........................................................18

    G.   Defendant's Privacy Violation Is Particularly Egregious.........................19

    H.   The Value of Plaintiff and Class Members Personal Information
        and Data. ....................................................................................................20

    I.   Google Could Have And Should Have Prevented Meta's Access to
        Personal Information..................................................................................23

V.   CLASS ALLEGATIONS .......................................................................................24

VI.  CLAIMS FOR RELIEF .........................................................................................28

COUNT I - ELECTRONIC COMMUNICATIONS PRIVACY ACT.......................................28

-i-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

COUNT II - RIGHT TO PRIVACY UNDER THE CALIFORNIA
    CONSTITUTION. ....................................................................................32

COUNT III - INTRUSION UPON SECLUSION UNDER CALIFORNIA
    COMMON LAW ....................................................................................34

COUNT IV - CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL
    CODE § 631 ...........................................................................................38

COUNT V - CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL
    CODE § 632 ...........................................................................................41

COUNT VI – CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL
    CODE § 635 ...........................................................................................44

COUNT VII - CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL
    CODE § 638.51 ......................................................................................46

COUNT VIII - BREACH OF CONTRACT ....................................................48

COUNT IX - BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING .......................50

COUNT X - RESTITUTION BASED ON QUASI-CONTRACT ...............................53

COUNT XI -  BREACH OF THIRD-PARTY BENEFICIARY CONTRACT ...........................55

COUNT XII – NEGLIGENCE ........................................................................57

COUNT XIII - DECLARATORY JUDGMENT, 28 U.S.C. §§ 2201, ET SEQ. ........................60

PRAYER FOR RELIEF .................................................................................62

DEMAND FOR JURY TRIAL ......................................................................64

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

Plaintiff, individually and on behalf of all others similarly situated, allege the following:

## I.    INTRODUCTION

1.    Users of Defendant Meta Platform, Inc.'s ("Meta") privacy rights were violated on Defendant Google, LLC's ("Google") Android devices running the Chrome web browser because Meta's native Android apps, like Facebook and Instagram, silently track users' internet browsing without the users' knowledge or consent and do so in ways which circumvented users' privacy rights.

2.    Meta's privacy breach and tracking methodology affects practically any person who has ever used the Facebook and Instagram applications on their Android device and used the Google Chrome internet browser.

3.    Meta's native Android apps receive browsing habits, browser metadata, cookies and commands from the Meta Pixel scripts embedded on thousands of web sites.

4.    These scripts load on users' mobile browsers (e.g. Google Chrome) and silently connect with native apps running on the same device through "localhost sockets."

5.    Meta's novel tracking method exploits unrestricted access to localhost sockets on the Android platforms, including most Android browsers and works even if the user is not logged into Facebook or Instagram on mobile browsers, uses Incognito mode, or clears their cookies or other browser data.

6.    Thus, while the data collected by Meta's software is supposed to be limited to particular situations, the loop exploited by Meta lets Meta Pixel scripts send Meta an Android owner's browsing data, cookies, and identifiers back to installed Meta apps like Facebook and Instagram.

7.    Thus, the next time one visited a website that embedded Meta Pixel, the script beamed that person's information back to the app.

8.    As a result, Meta obtained browsing data from a user's web activity, not via the browsing itself, but from the "unrelated" Instagram app.[1]

---

[1] https://lifehacker.com/tech/meta-apps-have-been-covertly-tracking-android-users-web-activity-for-months

-1-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

9. This meant that Meta was able to track what specific users watched, clicked or bought in order to serve them more personalized ads, permitting Meta to deanonyomze and identify particular users and their browsing activity.[2]

10. Meta's trackers perform this practice notwithstanding current privacy controls built into Android (e.g., sandboxing approaches, mobile platform and browser permissions, web consent models, incognito modes, resetting mobile advertising IDs, or clearing cookies), which are insufficient to control and mitigate it.

11. While localhost communications may be used for legitimate purposes such as web development, the research community has raised concerns about localhost sockets becoming a potential vector for data leakage and persistent tracking.

12. And to the best of researchers' knowledge, no evidence of real-world abuse for persistent user tracking across platforms has been reported - until now.

13. Beginning in or about September 2024, Defendant began such surreptitious tracking behaviors, promptly ending such actions in or about June 3, 2025, when security researchers' findings of Meta's activities were publicly exposed.

14. However, by the time that the researchers contacted Meta with their discovery of Meta's hand in the users otherwise-private data cookie jar, Meta had impermissibly culled the private, protected personal information and data from millions of users across the country, using that information for its business purposes to sell targeted advertising, thereby profiting from the same.

15. Meta's actions even have Google up in arms, with that entity noting that Meta "used Android's capabilities 'in unintended ways that blatantly violate our security and privacy principles.'"[3]

---

[2] https://www.tomsguide.com/computing/online-security/meta-called-out-for-tracking-android-users-across-the-web-without-their-consent-what-you-need-to-know

[3] https://news.sky.com/story/meta-found-covertly-tracking-android-users-through-instagram-and-facebook-13379083

-2-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

16. But Google lacks clean hands, it could have and should have prevented the data access at issue, particularly where other web browsers prevented the data access complained of here.

17. Because such actions violate the privacy rights of Plaintiff and the Class Members, along with statutory and common laws, Plaintiff brings this suit individually and on behalf of others similarly situated.

## II.    JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members exceeds 100, many of whom, including Plaintiff, have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

19. Under 28 U.S.C. § 1391, venue is appropriate in the Northern District of California because Defendants reside within this judicial district, with Defendant Meta Products, Inc., maintaining its principal place of business in this judicial district at 1 Meta Way, Menlo Park, CA and Defendant Google, LLC maintaining its principal place of business in this judicial district at 1600 Amphitheatre Parkway, Mountain View, CA.

20. In addition, the Northern District of California is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

21. Furthermore, under Section 4.4 of the Meta Terms of Service (available at https://www.facebook.com/terms/), Meta has dictated that any cases against it be filed in this judicial district: "You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County."

22. Likewise, under Google's Privacy & Terms (available at https://policies.google.com/terms?hl=en-US), disputes will be resolved exclusively in the federal

-3-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

or state courts of Santa Clara County, California, USA, and users and Google consent to personal jurisdiction in those courts.

23.   This Court has personal jurisdiction over Defendants because they conduct substantial business in this jurisdiction and because Plaintiff's claims arise out of or relate to Defendants' contacts with, and conduct within, this District. Further, this Court has general jurisdiction over Defendants because their corporate headquarters are located in this District.

24.   Personal jurisdiction against Meta Products, Inc. is also appropriate under Section 4.4 of the Meta Terms of Service: "You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions."

25.   Personal jurisdiction against Google, LLC is also appropriate under the Google Privacy & Terms, as users and Google consent to personal jurisdiction in the state or federal courts of Santa Clara County, California.

26.   Venue is appropriate because under Google's Privacy & Terms, disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and users and Google consent to personal jurisdiction in this Court.

### III.   PARTIES

**A.   Plaintiff.**

27.   Plaintiff Janet Woodward is a citizen and resident of California.

28.   Between May 2025 and June 2, 2025, Plaintiff has owned an Android device with one or more Meta apps installed, running and logged in.

29.   As part of Plaintiff's regular and ordinary use of her Android device, Plaintiff regularly browses the internet using the Google Chrome web browser from various locations within California.

30.   During the relevant time period, Plaintiff recalls visiting the Walmart, Kohls, Enterprise, Shein, ilMakiage, and AARP, websites regularly on her device.

-4-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

31.     On information and belief, Plaintiff visited websites that include Defendant's Meta's Meta Pixel software as these websites appear on the list of websites with Meta Pixel software prepared by security researchers.

32.     As a result of Plaintiff's visitation of such websites, on information and belief, Plaintiff believes that Meta, via the native Android apps installed on her phone, received browsers' metadata, cookies and commands from the Meta Pixel scripts embedded on those websites and which loaded on Plaintiff's mobile browsers and silently connected with Meta's native apps running on the same device through localhost sockets.

33.     Plaintiff received targeted advertising on one or more Meta apps.

34.     Plaintiff values her privacy and did not consent to Meta's use of the tracking techniques used here.

35.     Plaintiff intends to use Meta's applications and conduct internet searches and browsing via Google Chrome in the future.

**B.     Defendants and Their Business.**

**1.     Meta Products, Inc.**

36.     Defendant Meta Platforms, Inc. is a Delaware corporation that maintains its principal place of business and executive offices at 1 Meta Way, Menlo Park, CA 94025.

37.     Meta develops a variety of apps, wildly popular products used by more than three billion people worldwide,[4] including but not limited to Facebook (10B+ downloads, Instagram (5B+ downloads), Messenger (5B+ downloads), Threads (100M+ downloads), and WhatsApp (10B+ downloads).

38.     These apps are also among the top apps on Google Play in the United States, WhatsApp (#3), Threads (#4), Instagram (#5), Facebook (11), and Messenger (#12).[5]

---

[4] https://www.meta.com/about/company-info/?utm_source=about.meta.com&utm_medium=redirect

[5] https://appfigures.com/top-apps/google-play/united-states/top-apps

-5-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

39.     While Meta is publicly visible as a social media company, its primary business is actually surveillance advertising as substantially all of Meta's revenue currently generated from marketers' targeted advertising on Facebook and Instagram.[6]

40.     Meta's business model relies on collecting as much information as possible about people in order to sell highly-targeted ads, including to Plaintiff and Class Members.

41.     Meta is one of the main companies tracking individuals across the internet—monitoring activity far beyond its own platforms.

42.     For example, when Apple introduced changes to make tracking harder on iPhones, Meta lost billions in revenue, demonstrating just how valuable personal data is to its business.[7]

43.     To aid it in its ability to generate advertising revenue, Meta developed software currently known as the Meta Pixel, which it markets as a piece of code that website owners/developers can use to help them better understand the effectiveness of advertising, the actions visitors take on the website, like visiting a page or adding an item to their cart.

44.     The software also allows website owners/developers to see if customers took an action after seeing your ad on Facebook and Instagram, which can help them with retargeting advertising.[8]

45.     Pixel technology has been described by the Federal Trade Commission as a "privacy-invasive tracking technolog[y]."[9]

46.     However, as detailed further below, Meta Pixel software – combined with efforts to circumvent ordinary Android privacy protections - also facilitates Meta's collection of private, personal information that it had no consent, authorization or permission collecting.

---

[6] https://www.sec.gov/ix?doc=/Archives/edgar/data/1326801/000132680125000017/meta-20241231.htm#i20db9d0a42f0408c9f8cc4709c09099f_19

[7] https://www.eff.org/deeplinks/2025/01/mad-meta-dont-let-them-collect-and-monetize-your-personal-data

[8] https://www.facebook.com/business/tools/meta-pixel

[9] https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf

-6-

CLASS ACTION COMPLAINT

Case No. _____

**2.      Google, LLC**

47.      Defendant Google, LLC, is a Delaware limited liability company with principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

48.      Google is a technology company focusing on online advertising, search engine technology, cloud computing, computer software, quantum computing, e-commerce, consumer electronics, and artificial intelligence (AI).

49.      Google is the developer and owner of the Android operating system as well as the Chrome Browser.

## IV.      FACTUAL ALLEGATIONS

**A.      Background.**

50.      Tracking pixels have evolved from tiny, pixel-sized images on web pages for tracking purposes to include a broad range of HTML and JavaScript embedded in web sites (and email).[10]

51.      Tracking pixels can be hidden from sight and can track and send all sorts of personal data such as how a user interacts with a web page including specific items a user has purchased or information users have typed within a form while on the site.

52.      Businesses often want to use them to track consumer behavior (pageviews, clicks, interactions with ads) and target ads to users who may be more likely to engage or purchase something based on that prior online behavior.

53.      Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns. The data can be used to target more specific audiences with ads and other marketing messages. Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.

---

[10] https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

54. The use of pixel technology has the potential to lead to significant privacy invasions and harms,[11] which is exactly what happened here.

55. Meta's privacy violations complained of here initially came to discovery in or about January 2024,[12] when Gunes Acar, an assistant professor at Radboud University in the Netherlands, noticed something odd when he was on the university's website looking for course materials about online tracking and privacy.[13]

56. Typically, Acar said, information from Meta Pixel software flows one way: It connects once to your computer to send data to Meta's cloud.

57. But Acar watched the Meta Pixel software try to reconnect to his computer, which he altered to impersonate a web browser on an Android device.

58. To unravel this puzzling behavior, Acar enlisted collaborators at the Computer Security and Industrial Cryptography research group at Belgian university KU Leuven and IMDEA Networks, a research institute in Spain.

59. As Acar explained: "'I knew that the web page had various trackers, including Facebook's. But all of a sudden I saw that there was a connection with the local host,'" he told Spanish Newspaper El País.[14]

60. However, this connection should not have existed.

61. The data harvesting technique implemented by Meta conceptually resembles a common email tracking method.[15]

62. In that method, images with unique identifying strings are embedded in an email.

---

[11] https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf

[12]

[13] https://www.washingtonpost.com/technology/2025/06/06/meta-privacy-facebook-instagram/

[14] https://www.bankinfosecurity.com/researchers-meta-yandex-broke-android-privacy-a-28578

[15] https://www.androidpolice.com/meta-yandex-apps-de-anonymize-localhost-tracking/

-8-

CLASS ACTION COMPLAINT

Case No. _____

63.     When a recipient loads the email, the recipient's device pings the image server, which both loads the picture and sends the aforementioned unique identifier, informing the host that the recipient has opened the email.

64.     Meta's localhost tracking workaround does something similar, but significantly more complex.

65.     Ultimately, the loophole lets Meta's apps detect any websites one's visited that contain a tracking script called Meta Pixel, an extremely common bit of code embedded in countless popular websites for analytics purposes.

66.     And, as a system-level workaround, it can and did leverage multiple exploit vectors.

67.     Some of those vectors have already been sniffed out, patched, and side-stepped by Meta to continue under-the-radar surveillance.

68.     And using native Android apps to collect web browsing data defeats privacy protections such as user permission settings, browsing the web in Incognito mode and resetting the device's mobile advertising ID.

69.     Not even deleting cookies works against it.[16]

70.     As a result, Meta's covert tracking method defeats Google's Android's inter-process isolation and tracking protections based on partitioning, sandboxing, or clearing client-side state.

71.     Thus, "it negates every privacy control that you have in modern browsers and also in modern mobile platforms like Android."[17]

---

[16] https://www.bankinfosecurity.com/researchers-meta-yandex-broke-android-privacy-a-28578

[17] https://news.sky.com/story/meta-found-covertly-tracking-android-users-through-instagram-and-facebook-13379083

-9-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

**B.    Security Researchers Uncovered A Massive Privacy Invasion By Meta.**

72.    The security researchers publicly reported their findings, titled *Disclosure: Covert Web-to-App Tracking via Localhost on Android*, at the following URL https://localmess.github.io/

73.    As the research team explained, millions of websites contain a string of computer code from Meta that compiles web activity. It might capture the income reported to the government, an application for a student loan or even online shopping habits.

74.    As native apps (like Facebook and Instagram) access programmatically device identifiers like the Android Advertising ID (AAID) or handle user identities as in the case of Meta apps, this method effectively allowed Meta to link mobile browsing sessions and web cookies to user identities, de-anonymizing users' visiting sites embedding their scripts.

75.    As a result, this web-to-app ID sharing method bypasses typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls.

**C.    Meta Collected Users Private, Personal Information By Misusing Localhost Sockets.**

76.    Meta collected users' personal information by misusing unvetted access to localhost sockets.

77.    Localhost is a hostname referring to the specific local machine or computer on which the program is currently running. It permits users to connect with the services on the local machine's network without accessing an outer network. Put another way, "Localhost" is a word that your computer understands as "this computer" or "the computer You are using right now."[18]

78.    The Android OS allows any installed app with the INTERNET permission to open a listening socket on the loopback interface (127.0.0.1).

79.    Browsers running on the same device also access this interface without user consent or platform mediation.

---

[18] https://www.browserstack.com/guide/what-is-local-host

-10-

CLASS ACTION COMPLAINT

Case No. _____

80.     This allows JavaScript embedded on web pages to communicate with native Android apps and share identifiers and browsing habits, bridging ephemeral web identifiers to long-lived mobile app IDs using standard Web APIs.

81.     For example, the Meta (Facebook) Pixel JavaScript, when loaded in an Android mobile web browser, transmits the first-party _fbp[19] cookie using WebRTC to UDP ports 12580–12585 to any app on the device that is listening on those ports.

82.     The security researchers found Meta-owned Android apps Facebook (including version 515.0.0.23.90) and Instagram (including version 382.0.0.43.84), available on the Google Play Store, listening on these port range.

83.     The Meta Pixel uses a technique known as "SDP Munging"[20]  to insert the _fbp cookie contents to the SDP "ice-ufrag" field, resulting in a Binding Request STUN message sent to the loopback address as the following figure shows. This data flow cannot be observed using Chrome's regular debugging tools (such as DevTools).

_____

[19] https://web.archive.org/web/20250602140111/https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/

[20] SDP munging refers to the process of changing the SDP manually as opposed to letting the WebRTC API's do it.  https://webrtchacks.com/not-a-guide-to-sdp-munging/

-11-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

As researchers reported:



84. The flow of the _fbp cookie from web to native and the server traversed the following known path:

A. The user opens the native Facebook or Instagram app, which eventually is sent to the background and creates a background service to listen for incoming traffic on a TCP port (12387 or 12388) and a UDP port (the first unoccupied port in 12580-12585). Users must be logged-in with their credentials on the apps.

B. The user opens their browser and visits a website integrating the Meta Pixel.

C. At this stage, websites may ask for consent depending on the website's and visitor's locations.

D. The Meta Pixel script sends the _fbp cookie to the native Instagram or Facebook app via WebRTC (STUN) SDP Munging.

E. The Meta Pixel script also sends the _fbp value in a request to https://www.facebook.com/tr along with other parameters such as page URL

-12-

CLASS ACTION COMPLAINT

Case No. _____

(dl), website and browser metadata, and the event type (ev) (e.g., PageView, AddToCart, Donate, Purchase).

    F.  The Facebook or Instagram apps receive the _fbp cookie from the Meta Pixel JavaScript running on the browser. The apps transmit _fbp as a GraphQL mutation to (https://graph[.]facebook[.]com/graphql) along with other persistent user identifiers, linking users' fbp ID (web visit) with their Facebook or Instagram account.

85.    The foregoing is graphically depicted below:



86.    On or around May 17th, Meta Pixel added a new method to their script that sends the _fbp cookie using WebRTC TURN instead of STUN.

-13-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

87.    Notably, when Google earlier this year modified[21] the mobile Chrome browser to stop allowing that type of SDP munging that was being utilized by Meta, Meta responded within days with a workaround, researchers said.[22]

88.    The new TURN method avoids SDP Munging, which Chrome developers publicly announced to disable following the researchers' disclosure.

89.    As of June 2, 2025, researchers have not observed the Facebook or Instagram applications actively listening on these new ports.

90.    According to Meta's Cookies Policy, the _fbp cookie[23] identifies browsers for the purposes of providing advertising and site analytics services and has a lifespan of 90 days.

91.    The cookie is present on approximately 25% of the top million websites, making it the 3rd most common first-party cookie of the web, according to Web Almanac 2024.[24]

92.    A first-party cookie implies that it cannot be used to track users across websites, as it is set under the website's domain. That means the same user has different _fbp cookies on different websites.

93.    However, the method used by Meta allows the linking of the different _fbp cookies to the same user, which bypasses existing protections and runs counter to reasonable user expectations.

94.    As if this were not enough, Meta's actions created another risk: the risk of users' browsing history leaking.

---

[21] https://chromium.googlesource.com/chromium/src/+log/136.0.7103.126..137.0.7151.61?pretty=fuller&n=10000

[22] https://www.bankinfosecurity.com/researchers-meta-yandex-broke-android-privacy-a-28578

[23] https://web.archive.org/web/20250602140832/https://www.facebook.com/privacy/policies/cookies/?subpage=subpage-1.3

[24] https://almanac.httparchive.org/en/2024/cookies#top-first-and-third-party-cookies-and-domains-setting-them

-14-

95.     As the researchers explained, by using HTTP requests for web-to-native ID sharing (i.e. not WebRTC STUN or TURN), such acts may expose users browsing history to third-parties.

96.     A malicious third-party Android application that also listens on the aforementioned ports can intercept the HTTP requests sent by the first, now-unused, implementation of Meta's communication channel by monitoring the Origin HTTP header.

97.     The researchers developed a proof-of-concept app to demonstrate the feasibility of this browsing history harvesting by a malicious third-party app.

98.     They found that browsers such as Chrome, Firefox and Edge are susceptible to this form of browsing history leakage in both default and private browsing modes.

99.     Moreover, while the possibility for other apps to listen to these ports exist, researchers have not observed any other app, not owned by Meta, listening to these ports.

**D.      The Wide Ranging Scope of Defendant's Scheme Permitted It To Obtain Private Information from Millions of Android Owners via Millions of Websites.**

100.     According to BuiltWith, a website that tracks web technology adoption, the Meta Pixel software is embedded on over 5.8 million websites.[25]

101.     According to HTTP Archive, an open and public dataset that runs monthly crawls of ~16 million websites, Meta Pixel is present on 2.4 million websites.

102.     To measure how widespread the use of localhost sockets is across sites, the researchers performed two web crawls on the top 100k sites (based on CrUX rankings[26]) from servers located in Frankfurt and in New York.

103.     The following table shows the number of sites found affected for each case in the United States. The first column shows the number of sites embedding these trackers when accepting all cookie consent forms. The second column (labeled as "no consent") reports the

---

[25] https://trends.builtwith.com/websitelist/Facebook-Pixel
[26] https://github.com/zakird/crux-top-lists

-15-

CLASS ACTION COMPLAINT

Case No. _____

number of sites actively attempting to perform localhost communications by default as soon as the user loads them on their browser, i.e., potentially without user consent.

| Script name | US presence | US no consent |
|-------------|-------------|---------------|
| Meta Pixel | 17,223 | 13,468 (78.2%) |

104.    The researchers also reported the sites where Facebook/Meta pixel script attempts to share the _fbp ID with their Android apps using WebRTC, identifying the URL and CrUX rank of the site, and if they were found in the US crawl.

105.    When visiting the site, researchers' crawler waited for the page to load, after which it accepted all cookies on the site (if any). It then waited a further ten seconds, while collecting all HTTP requests, WebSocket frames and WebRTC function calls made during the visit.

106.    Analyzing this data, researchers found Meta's Pixel sending to localhost on 17,223 sites accessed from the US.

107.    And to assess whether these tracking practices occur without potential user consent, researchers performed a second crawling campaign, this time without interacting with the cookie consent window (if any is presented to the user).

108.    Incredibly, even without actively giving consent to these sites (i.e., not accepting any cookies or no consent window), the Meta Pixel sends the fbp cookie to localhost on 13,468 sites accessed from the US potentially without consent.

109.    In identifying such sites and compiling such a list on their investigation website, the researchers were careful to note that their crawling campaign was not exhaustive nor complete.

110.    Instead, its purpose was to assess the prevalence of these behaviors in a representative sample of web sites.

111.    Therefore, the absence of a website in the researcher's list does not necessarily imply that it does not integrate these tracking capabilities.

-16-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

**E.    Defendant's Covert Web-to-App Tracking Scheme Began No Later Than September 2024.**

112.    The methods used by Meta evolved over time, as depicted in the below chart listing the date on which each method was first observed based on historical HTTP Archive data.

| | Method | Start date (first seen) | End date (last seen) | Ports | Har files |
|---|---|---|---|---|---|
| Meta | HTTP | Sep 2024 | Oct 2024[27] | 12387 | 1, 2, 3, 4, 5, |
| | Websocket | Nov 2024 | Jan 2025 | 12387 | 1, 2, 3, 4, 5, |
| | WebRTC STUN (w/ SDP Munging) | Nov 2024 | - | 12580-12585 | 1, 2, 3, 4, 5, |
| | WebRTC TURN[28] (w/o SPD Munging) | May 2025 | - | 12586-12591 | - |

113.    Meta apparently knew of this issue but appears to have done nothing in response to end this tracking.

114.    In fact, Meta likely did nothing in order to obtain a financial benefit from such tracking.

115.    Specifically, researchers found no public technical documentation from Meta describing this specific localhost-based communication technique.

116.    However, in Facebook's developer forums, some raised concerns about Pixel scripts contacting localhost, but they received no explanation.

117.    For example, Facebook developer forum user "Olly" noted that

> Since 5th September, our internal JS error tracking has been flagging failed fetch requests to localhost:12387. No changes have been made on our side, and the existing Facebook tracking pixel we use loads via Google Tag Manager.
>
> Specifically, on closer inspection, the config file found at - https://connect.facebook.net/signals/config/ - has this chunk of code within it that tries to make a call to localhost.[29]

---

[27] Meta Pixel script was last seen sending via HTTP in Oct 2024, but Facebook and Instagram apps still listen on this port as of the publication of the research team's findings. They also listen on port 12388 for HTTP, but the research team did not find any script sending to 12388.

[28] For this, the researchers noted that Meta Pixel script sends to these ports, but Meta apps do not listen on them at the time, speculating that this behavior could be due to slow/gradual app rollout.

[29] https://web.archive.org/web/20250531105747/https://developers.facebook.com/community/threads/317050484803752/

-17-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

118. The status of this inquiry was identified as "unresolved."

119. Similarly, Facebook developer forum user "Dermot" asked "Why does my Pixel Javascript access http://localhost when in an embedded web view on Android."[30]

120. Likewise, the status of resolution of this question was also marked as "unresolved."

**F. Researchers Disclose Their Findings, Meta Largely Stops Using the Technique and Google Blocks It.**

121. Researchers disclosed their findings and Meta promptly stopped using the technique by no later than June 3rd 7:45 CEST, at which time the Meta/Facebook Pixel script no longer sent any packets or requests to localhost.

122. Moreover, the code responsible for sending the _fbp cookie has been almost completely removed.

123. At the same time, Google shipped countermeasures in May 26 update for the Android Chrome browser with protections under trial that would block Meta from using known web-to-app techniques.[31]

124. Publicly, Meta has chalked this pervasive tracking as a mere miscommunication: "We are in discussions with Google to address a potential miscommunication regarding the application of their policies. Upon becoming aware of the concerns, we decided to pause the feature while we work with Google to resolve the issue."[32]

125. However, Meta's methods to surreptitiously obtain the private information and data of Plaintiff and Class Members evolved over time, directly undermining this contention.

---

[30] https://web.archive.org/web/20250531105711/https://developers.facebook.com/community/threads/937149104821259/

[31] https://www.bankinfosecurity.com/researchers-meta-yandex-broke-android-privacy-a-28578

[32] https://lifehacker.com/tech/meta-apps-have-been-covertly-tracking-android-users-web-activity-for-months

-18-

CLASS ACTION COMPLAINT

Case No. _____

**G.    Defendant's Privacy Violation Is Particularly Egregious.**

126.    Incredibly, no privacy setting could have stopped Meta's methods utilized to specifically circumvent privacy and security protections that Google set up for Android devices.

127.    As described in an article published on Ars Technica, "[o]ne of the fundamental security principles that exists in the web, as well as the mobile system, is called sandboxing," Narseo Vallina-Rodriguez, one of the researchers behind the discovery, said in an interview.[33]

128.    This "sandboxing" feature in Android devices is intended to keep apps separate and from communicating with each other without the approval of the user.

129.    Yet Meta circumvented these safeguards through the described, rare loophole: localhost connections.[34]

130.    As Vallina-Rodriguez explained, "You run everything in a sandbox, and there is no interaction within different elements running on it. What this attack vector allows is to break the sandbox that exists between the mobile context and the web context. The channel that exists allowed the Android system to communicate what happens in the browser with the identity running in the mobile app."[35]

131.    According to the same article, a representative for Google said the behavior violates the terms of service for its Play marketplace and the privacy expectations of Android users.

132.    Similarly, Google acknowledged to the Washington Post that that the behaviors of Meta "blatantly violate our security and privacy principles."[36]

133.    "The developers in this report are using capabilities present in many browsers across iOS and Android in unintended ways that blatantly violate our security and privacy

---

[33] https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/

[34] https://www.techtimes.com/articles/310610/20250604/android-safe-meta-yandex-exploiting-loophole-track-your-browsing-data-says-researchers.htm

[35] https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/

[36] https://www.washingtonpost.com/technology/2025/06/06/meta-privacy-facebook-instagram/

-19-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

principles," the representative said, referring to the people who write the Meta Pixel JavaScript [e.g., Meta]. "We've already implemented changes to mitigate these invasive techniques and have opened our own investigation and are directly in touch with the parties."

**H.      The Value of Plaintiff and Class Members Personal Information and Data.**

134.    Plaintiff and Class Members' data is valuable and becoming increasingly so.

135.    For someone living in the United States, Plaintiff and Class Members' data likely generates hundreds of dollars in revenue for Defendant.[37]

136.    Based on 2023 data, for users in the United States like Plaintiff and Class Members, Defendant's average annual revenue per Facebook user was $217.26.

137.    Per another source, Meta (Facebook + Instagram) generates $235 in revenue per American user annually, almost exclusively for serving personalized ads.[38]

138.    Meta's 2023 revenue figures don't include Instagram, WhatsApp, and other platforms, which had 3.74 billion monthly active users (new window) as of December 2022.

139.    Furthermore, this likely inadequately captures the value of Plaintiff and the Class Members' data.

140.    In Facebook's advertising model, personal data reflects just one piece of the puzzle.

141.    Advertisers pay Meta for the data not only to accurately target their audience, but they also pay just for the access to that audience, i.e. the attention of Plaintiff and the Class Members.

142.    Thus, important to distinguish what part of the annual revenue per user is attributable to the data itself and what part the companies are paying just to have an ad show up in your feed.

---

[37] https://proton.me/blog/what-is-your-data-worth
[38] https://www.datapods.app/en-US/blog/what-your-data-is-actually-worth

-20-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

143. According to a study by the Network Advertising Initiative, advertisers are willing to pay 2.68 times more for personalized advertising than for non-personalized advertising.

144. This is because targeted advertising is twice as effective at converting users who click on the ad into buyers.

145. This figure can be used for a rough estimate of the value of your personal data to the online advertising industry.

146. Applied to Meta's $235 ARPU, this results in an annual value of about $147 (or $12.25 per month) for the average user's personal data.

147. With an ARPU of around $420 for the entire online advertising industry, this results in a value of $263 per year (or $22 per month).

148. Moreover, in response to certain data protection regulations designed to limit the processing of personal data for advertising purposes, Meta is also reported to be offering a subscription model in Europe that would allow users to use Facebook and Instagram ad free, with a full subscription to both platforms said to cost up to 192 euros per year, effectively putting a market price on privacy.[39]

149. Not showing ads to an average user from a high-income country like the United States costs Meta around $200.[40]

150. Furthermore, web browsing histories are personal data.[41]

151. With respect to browsing history alone, a 2011 survey assigned a $52 dollar value to web search history.[42]

152. Moreover, research companies pay for phone activity like that impermissibly pertained by Meta here.

---

[39] https://www.datapods.app/en-US/blog/what-your-data-is-actually-worth

[40] https://www.datapods.app/en-US/blog/what-your-data-is-actually-worth

[41] https://blog.lukaszolejnik.com/web-browsing-histories-are-private-personal-data-now-what/

[42] https://web.archive.org/web/20120415183832/http://designmind.frogdesign.com/blog/what039s-your-personal-data-worth.html

-21-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

153.    For example, research company Nielsen's Computer & Mobile panel research program allows people to join their research panel, which aims to understand how consumers use the internet by studying the websites people visit.  By consenting to sign up their smartphones to send anonymized data such as the URL visited, Neilsen pays users weekly points which can be redeemed and valued at $30 for a mobile phone.[43]

154.    Another research company utilizes software that collects and measures online behavior of device users, including activity in secure sessions, web forms, shopping baskets and similar interactions. By consenting to participate, users receive a $10 gift card.[44]

155.    Likewise, a Google sponsored research program paid invited – and consenting – participants who allow their phone activity to be tracked to earn up to $1.50 per week.[45]

156.    With the personal data history in hand and obtained through its covert web-to-app tracking scheme, Meta was likely able to sell further increased and targeted advertising to Plaintiff and the Class Members, through the use of information that it should not have received nor retain possession of.

157.    Indeed, Meta saw dramatically increased revenues compared to the prior year once it implemented its covert web-to-app tracking scheme.

158.    For example, during the period October to December 2024, after Meta implemented its covert web-to-app tracking scheme, Meta reported $48.385 billion in revenue, a 21% increase from the $40.111 billion revenue reported for the same quarter in 2023.[46]

159.    Similarly, during the period January to March 2025, Meta reported $42.314 billion in revenue, a 16% increase from the $36.455 billion reported for the same quarter in 2024.[47]

---

[43] https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[44] https://www.permissionresearch.com/PrivMem.aspx

[45] https://www.verifythis.com/article/news/verify/technology-verify/google-tracking-study-payment-verify/67-1cc2e9a3-f51b-489b-aef8-1477201c0c11

[46] https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-Fourth-Quarter-and-Full-Year-2024-Results/default.aspx

[47] https://investor.atmeta.com/investor-news/press-release-details/2025/Meta-Reports-First-Quarter-2025-Results/default.aspx

-22-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

## I.    Google Could Have And Should Have Prevented Meta's Access to Personal Information.

160.    With respect to Google, it could have and should have prevented Meta's unauthorized and unapproved access to the data of Plaintiff and the Class Members.

161.    Google recognizes that Meta's behavior violates the terms of service for its Play marketplace and the privacy expectations of Android users, using "capabilities present in many browsers across iOS and Android in unintended ways that blatantly violate our security and privacy principles." [48]

162.    As a result, Google "We've has implemented changes to mitigate these invasive techniques and have opened our own investigation and are directly in touch with the parties."

163.    Moreover, as one security researcher noted, "[t]he fundamental issue is that the access to the local host sockets is completely uncontrolled on Android," he explained.

164.    "There's no way for users to prevent this kind of communication on their devices. Because of the dynamic nature of JavaScript code and the difficulty to keep blocklists up to date, the right way of blocking this persistently is by limiting this type of access at the mobile platform and browser level, including stricter platform policies to limit abuse."

165.    Google should have done this and in fact later did so but not before Defendant Meta obtained the private data of Plaintiff and the Class Members. Google's Chrome Version 137, released on 26 May 2025, shipped countermeasures to block abused ports and disable the specific form of SDP munging that Meta Pixel used. As of 2 June 2025, these defenses are reportedly being trialed for a subset of Chrome users and will likely be released to the general public soon. Such protections appear to operate to block the currently used forms of Meta localhost communications. [49]

166.    However, Google's countermeasures occurred too late as Meta had already been harvesting the private information of Plaintiff and Class Members since in or about September 2024.

---

[48] https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/

[49] https://localmess.github.io/

-23-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

167.    Google could have and should have blocked the abusive JavaScript in trackers as reflected by the fact that other companies' browsers already prevented such data access.

168.    The DuckDuckGo browser, for instance, was already blocking domains and IP addresses associated with the trackers, preventing the browser from sending any identifiers to Meta.

169.    Similarly, the Brave browser also blocked the sharing of identifiers due to its extensive blocklists and existing mitigation to block requests to the localhost without explicit user consent.

170.    And, the Vivaldi browser forwards the identifiers to local Android ports when the default privacy setting is in place, and changing the setting to block trackers appears to thwart browsing history leakage according to researchers.

## V.    CLASS ALLEGATIONS

171.    Plaintiff brings this nationwide class action on behalf of herself and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

172.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All Android users in the United States who, between September 2024 and June 2, 2025: (1) installed Defendant Meta Products, Inc.'s native Android apps (e.g., Facebook or Instagram) on their Android device; (2) logged into Defendant's native Android apps; (3) visited a website with Defendant's Meta Pixel software installed by using Google Chrome browser; (4) and had their browsers' metadata, cookies and commands from the Meta Pixel collected by Defendant.

173.    The California Subclass that Plaintiff seeks to represent is defined as follows:

> All Android users in the state of California who, between September 2024 and June 2, 2025: (1) installed Defendant Meta Products, Inc.'s native Android apps (e.g., Facebook or Instagram) on their Android device; (2) logged into Defendant's native Android apps; (3) visited a website with Defendant's Meta Pixel software installed by using Google Chrome browser; (4) and had their browsers' metadata, cookies and commands from the Meta Pixel collected by Defendant.

-24-

174.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

175.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

176.    **Numerosity**, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are millions of individuals whose Private Information may have been improperly accessed and the Class is readily identifiable within Defendants' records.

177.    **Commonality**, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

    A.  Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

    B.  Whether Meta had duties not to collect or use the Private Information of Plaintiff and Class Members;

    C.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiff and Class Members;

    D.  Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information collected;

    E.  Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the collection of data;

-25-

F.  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

G.  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

H.  Whether Plaintiff and Class Members are entitled to restitution as a result of Defendants' wrongful conduct; and

I.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's improper data access.

178.  **Typicality**, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Defendant's software, due to Defendants' misfeasance.

179.  **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all the Plaintiff's and Class Members' data was maintained and unlawfully accessed in the same way through software developed by Defendant. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. Defendant's practices and policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

180.  **Adequacy of Representation**, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class

-26-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

181. **Superiority**, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

182. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

183. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, including its uniform method of data collection, the consistent provisions and application of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

-27-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

184. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

185. Unless a class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this Complaint.

186. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

187. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

## VI.   CLAIMS FOR RELIEF

### COUNT I - ELECTRONIC COMMUNICATIONS PRIVACY ACT

188. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

189. Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant Meta Products, Inc.

190. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the contents of any electronic communication without the consent of at least one of the parties to said communication. 18 U.S.C. § 2511.

191. The ECPA protects both the sending and receiving of electronic communications, like those at issue here.

192. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of this law, which is what occurred here with Defendant's secret web-to-app tracking scheme. 18 U.S.C. § 2520(a).

-28-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

193. Section 18 USC § 2510(4) defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

194. Section 18 USC § 2510(8) in turn broadly defines "contents," which "when used with respect to any wire, oral, or electronic communication," includes "any information concerning the substance, purport, or meaning of that communication."

195. Here, Defendant intercepted the contents of Plaintiff and Class Member communications via its covert web-to-app tracking via localhost scheme.

196. Meta intentionally intercepted electronic communications that Plaintiff and Class Members exchanged with websites visited on their Android while logged into Defendant's apps through the Meta Pixel installed on various public websites via its covert web-to-app tracking via localhost on Android.

197. The transmissions of Plaintiff and Class Members browsing data, cookies, and identifiers, along with their interactions with websites, are "electronic communications" under the ECPA as they are a "transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

198. Through its covert web-to-app tracking via localhost on Android, Meta contemporaneously and surreptitiously acquired Plaintiff's and Class Members' communications with such websites.

199. The intercepted communications Meta harvested via its covert web-to-app tracking via localhost on Android include, but are not necessarily limited to, browsing data, cookies, and identifiers.

200. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    A. The cookies Meta uses to track Plaintiff's and Class Members' communications;

    B. Plaintiff's and Class Members' Google Chrome browsers;

-29-

CLASS ACTION COMPLAINT

Case No. _____

C.  Plaintiff's and Class Members' Android computing devices;

D.  Meta's web-servers;

E.  The web-servers or webpages where the Meta Pixel is present;

F.  The Meta Pixel source code Meta deploys to acquire Plaintiff's and Class Members' communications; and

G.  Defendant's software used to facilitate web-to-app tracking via localhost on Android.

201.    Such devices operate by transmitting signals through a wire, cable, or other like connection used in wire connection.

202.    Defendant knows, or at a minimum had reason to know, that such devices or any component thereof had been sent through the mail or transported in interstate or foreign commerce.

203.    Meta is not a party to Plaintiff's and Class Members' communications with the websites they interact with and browse.

204.    Meta receives the content of Plaintiff's and Class Members' communications through the surreptitious redirection of those communications from the Plaintiff's and Class Members' Android computing devices via covert web-to-app tracking via localhost on Android.

205.    Plaintiff and Class Members did not consent to Meta's acquisition of their electronic communications in the manner described in this Complaint, nor could they have given Meta's use of covert web-to-app tracking via localhost on Android.

206.    Meta did not obtain legal authorization to obtain Plaintiff's and Class Members' electronic communications, let alone via covert web-to-app tracking via localhost on Android.

207.    Meta did not require any website to obtain the lawful rights to share the content of Plaintiff's and Class Members' communications that Meta collected via covert web-to-app tracking via localhost on Android.

-30-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

208.    Any purported consent that Meta received from websites to obtain the content of Plaintiff's and Class Members' communications was not valid, particularly where Meta's actions blatantly violated Google's security and privacy principles.

209.    In violation of 18 U.S.C. § 2511(d), Meta intentionally used and/or endeavored to use the contents of the wire or electronic communications described herein, while knowing or having reason to know that the information was obtained through the interception of a wire or electronic communication in violation of 18 U.S.C. § 2511.

210.    To that end, Defendant intercepted the communications in furtherance of its business of selling and profiting from its targeted advertising services.

211.    In acquiring the content of Plaintiff's and Class Members' communications, Meta had a purpose that was tortious, criminal, and designed to violate state constitutional and statutory provisions including:

    A.  A knowing intrusion upon Plaintiff's and Class Members' seclusion;

    B.  Violation of Plaintiff's and Class Members' constitutional right to privacy under the California Constitution; and

    C.  Violation of various state computer privacy and property statutes, including but not limited to the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632, 635, 638.51.

212.    Meta knew its conduct would be highly offensive, as evidenced by the fact it nearly immediately stopped the data collection practice upon public disclosure of the same by security researchers and the press.

213.    Meta's violations of the ECPA were willful and intentional and caused Plaintiff and Class Members the following damages:

    A.  The interruption or preclusion of Plaintiff's and Class Members' ability to communicate with websites;

    B.  The diminution in value of Plaintiff's and Class Members' personal information;

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

C. The inability to use their computing devices for the purpose of communicating with websites;

D. The loss of privacy due to Meta making private information that Plaintiff and Class Members intended to remain private no longer private; and

E. Meta took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without Meta sharing the benefit of such value.

214. For Meta's violations set forth above, Plaintiff and Class Members seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Meta] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred pursuant to 18 U.S.C § 2520.

215. Unless enjoined, Meta will continue to commit the violations of law alleged here. Plaintiff and Class Members want to continue to browse the internet on their Android devices but have no practical way of knowing if their communications continue to be intercepted by Meta, particularly where the code responsible for sending the _fbp cookie has been "almost completely removed," therefore not completely removed, and thus continue to be at risk of harm from Meta's conduct.

216. Pursuant to 18 U.S.C. § 2520, Plaintiff and Class Members seek monetary damages for the greater of (i) the sum of the actual damages suffered by the plaintiff and any profits made by Meta as a result of the violation or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

**COUNT II - Right to Privacy Under the California Constitution.**

217. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

218. Plaintiff brings this claim individually and on behalf of members of the California Class against Defendant Meta Products, Inc.

-32-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

219. Art. I, § 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*." Art. I, § 1, Cal. Const. (emphasis added).

220. The right to privacy in California's Constitution creates a private right of action against private entities.

221. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

222. Defendant violated Plaintiff and California Class Members' constitutional right to privacy by collecting, storing, and using personal information in which they had a legally protected privacy interest, and for which they had a reasonable expectation of privacy. Defendant's accessing of such personal information was highly offensive given the sensitive nature of the data and the covert way in which Defendant acquired the data of Plaintiff and the Class Members. Accordingly, Defendant's collection of Plaintiff's and Class Members' private information and data is an egregious violation of social norms.

223. Defendant intruded upon Plaintiff and Class Members' legally protected privacy interests, including by collecting and misusing the private data of Plaintiff and the Class Members through a covert web-to-app tracking scheme.

224. Plaintiff and Class Members enjoyed objectively reasonable expectations of privacy in their communications based on:

    A. The ECPA;

    B. The ordinary operation of typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls, which Defendant's data tracking scheme bypassed;

-33-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

C.  The terms of the Google Play Developer Distribution Agreement, which required Defendant to protect the privacy and legal rights of Plaintiff and Class Members;

D.  California common law and statutory privacy laws;

E.  The lack of consent or authorization by Plaintiff and the Class Members to permit Defendant's access to and collection of private information and data of Plaintiff and the Class Members; and

F.  The fact that Plaintiff and Class Members could not reasonably expect Defendant would commit acts in violation of contracts and laws protecting their privacy.

225.   As a result of Defendant's actions, Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation.

226.   Plaintiff and Class Members suffered actual and concrete injury as a result of Defendants' violations of their privacy interests. Plaintiff and Class Members are entitled to appropriate relief, including damages to compensate them for the harms to their privacy interests, loss of valuable rights and protections, risk of future invasions of privacy, and the mental and emotional distress and harm to human dignity interests caused by Defendants' invasions.

227.   Plaintiff and Class Members seek appropriate relief for that injury, including, but not limited to, damages that will reasonably compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiff and Class Members privacy.

**COUNT III - Intrusion Upon Seclusion Under California Common Law**

228.   Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

229.   Plaintiff brings this claim individually and on behalf of the Nationwide Class.

-34-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

230. By collecting and disseminating the contents of Plaintiff's and Class Members' communications with websites (including browsing habits, browser metadata, cookies and commands) without their knowledge, Meta intentionally intruded into a realm in which Plaintiff and Class Members have a reasonable expectation of privacy.

231. The communications at issue regarding the Named Plaintiff include, but are not necessarily limited to, browsing habits, browser metadata, cookies and commands.

232. Plaintiff and Class Members enjoyed objectively reasonable expectations of privacy in their communications based on:

A. The ECPA;

B. The ordinary operation of typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls, which Defendant's data tracking scheme bypassed;

C. The terms of the Google Play Developer Distribution Agreement, which required Defendant to protect the privacy and legal rights of Plaintiff and Class Members;

D. California common law and statutory privacy laws;

E. The lack of consent or authorization by Plaintiff and the Class Members to permit Defendant's access to and collection of private information and data of Plaintiff and the Class Members; and

F. The fact that Plaintiff and Class Members could not reasonably expect Defendant would commit acts in violation of contracts and laws protecting their privacy.

233. Furthermore, Plaintiff and Class Members maintained a reasonable expectation of privacy when providing information and when communicating with websites online.

234. Meta purports to be committed to "[p]rotecting privacy and security…while adhering to stringent industry standards for privacy and protecting your data."

-35-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

235. It also declares that it is "ensuring new products and features are built with privacy in mind."[50]

236. And it declares that "[s]ince 2019, we've invested $5.5 billion in a rigorous privacy program that identifies and addresses privacy risks early and embeds privacy into our products from the start."[51]

237. Meta obtained unwanted access to Plaintiff's and Class Members' data, including but not limited to browsing habits, browser metadata, cookies and commands that Plaintiff and Class Members exchanged with websites viewed on Google Chrome while logged into Defendant's apps.

238. Meta's intrusion was also accomplished by placing the "fbp" cookie on the Plaintiff's and Class Members' computing devices through the web-servers of the websites visited by Plaintiff and Class Members and through the misuse of unvetted access to local host sockets.

239. By covertly tracking and misusing unvetted access to localhost sockets in order to receive browsers' metadata, cookies and commands from the Meta Pixel scripts embedded on thousands of websites, Meta ensured that it could hack its way around attempts that Plaintiff and Class Members might make to prevent Meta's tracking.

240. Indeed, web-to-app ID sharing method bypasses typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls.

241. And Meta's tracking works without user awareness, as current privacy controls (e.g., sandboxing approaches, mobile platform and browser permissions, web consent models, incognito modes, resetting mobile advertising IDs, or clearing cookies) are insufficient to control and mitigate it.

242. Meta's deployment of the tracking methodology on Plaintiff and Class Members' computing devices is a highly offensive intrusion upon seclusion regardless of whether any

---

[50] https://www.meta.com/actions/protecting-privacy-and-security/?srsltid=AfmBOoqBPiJaZ5_H_wO5WhIANbiHK_Pgpxj1UDMnCaz9FtrDCLKSNt_9

[51] https://www.facebook.com/privacy/resources

-36-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

information was further re-directed from the Plaintiff or Class Members computing devices to Meta.

243.    Meta's intrusion into Plaintiff's and Class Members' privacy, including the employment of the tracking methodology on Plaintiff's and Class Members' devices, would be highly offensive to a reasonable person, namely because it occurred without Plaintiff's and Class Members' consent or knowledge and violated

     A.  The ECPA;

     B.  The ordinary operation of typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls, which Defendant's data tracking scheme bypassed;

     C.  The terms of the Google Play Developer Distribution Agreement, which required Defendant to protect the privacy and legal rights of Plaintiff and Class Members; and

     D.  California common law and statutory privacy laws.

244.    Meta's covert tracking scheme and exploitation of unrestricted access to localhost sockets on Android platforms is highly offensive to a reasonable person because:

     A.  It involved placement of a tracking tool on Plaintiff's and Class Members' personal communications and computing devices while they were exchanging communications in what should have been private conversation with websites – and that tracking tool persisted on Plaintiff and Class Member devices; and

     B.  Meta intended that the tracking method would be performed without user awareness that their browsing habits, browser metadata, cookies and commands were being tracked and collected by Meta, as current privacy controls (e.g., sandboxing approaches, mobile platform and browser permissions, web consent models, incognito modes, resetting mobile advertising IDs, or clearing cookies) are insufficient to control and mitigate it.

245.    Meta's intrusion caused Plaintiff and Class Members the following damages:

-37-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

A. Nominal damages;

B. The interruption or preclusion of Plaintiff's and Class Members' ability to privately communicate with websites;

C. The diminution in value of Plaintiff's and Class Members' private information;

D. The inability to use their computing devices for the purpose of privately communicating with websites;

E. The loss of privacy due to Meta making sensitive and confidential information such as browsing habits, browser metadata, cookies and commands that Plaintiff and Class Members intended to remain private no longer private; and

F. Meta took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without Meta sharing the benefit of such value.

246.    Meta's intrusion into Plaintiff's and Class Members' seclusion was with oppression, fraud, or malice.

247.    For Meta's intrusion into their seclusion, Plaintiff and Class Members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court deems just.

**COUNT IV- California Invasion of Privacy Act, Cal. Penal Code § 631**

248.    Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

249.    Plaintiff brings this claim individually and on behalf of members of the California Subclass against Defendant Meta Products, Inc.

250.    Plaintiff and Class Members have a private right of action under Cal. Penal Code § 631 via Cal. Penal Code § 637.2.

251.    In adopting the CIPA, the California Legislature recognized "that advances in science and technology have led to the development of new devices and techniques for the

-38-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 631,

252. As a result, the Legislature, via the CIPA, intended "to protect the right of privacy of the people of this state." Cal. Penal Code § 631.

253. CIPA provides a cause of action where, as here, Meta willfully and without the consent of all parties to the communication intercepted, used, or disclosed the contents of a communication in transit. Cal. Penal Code § 631(a).

254. Defendant's native Android apps—including Facebook, Instagram—silently listened on fixed local ports for tracking purposes, in order for Defendant to instantly receive browser search history, browsers' metadata, cookies and commands from the Meta Pixel scripts embedded on thousands of web sites.

255. Defendant's Meta Pixel JavaScripts loaded on Plaintiff and Class Member mobile browsers silently connected with native apps running on the Plaintiff and Class Member devices through localhost sockets, allowing Defendant to obtain and/or link private mobile browsing sessions and web cookies to user identities, de-anonymizing users' visiting sites embedding Defendant's scripts, without consent of any party to the communication, let alone consent from Plaintiff and the Class Members.

256. Such actions permitted Defendant to read, attempt to read, or to learn contents or meaning of Plaintiff and Class Members communications with websites while it is in transit or passing over a wire, line, or cable.

257. In violation of Cal. Penal Code § 631(a), Defendant, by "means of any machine, instrument, or contrivance, or in any other manner," i.e., Defendant's apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets:

    A. Intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any

-39-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

B. Willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, or attempted to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within California;

C. Used, or attempted to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; and/or

D. Aided, agreed with, employed, or conspired with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above.

258. Defendant did not have the authorization or the consent of all parties (whether Plaintiff, Class Members, or the website) to the communications at issue, and as a result, it did not and could not obtain such consent prior to Defendant's interception of the communications.

259. Indeed, neither Plaintiff nor any Class Member expressly or impliedly consented to Defendant's actions when they used their Google Chrome browsers on their Android devices.

260. Such information and communications at issue were sent and/or received within California, particularly where Plaintiff and California Subclass Members were located in and used their Android devices within California.

261. Plaintiff and Class Members have been injured by Defendant's actions in violation of Cal. Penal Code § 631(a), which is traceable to Defendant's development and use of Defendant's apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets to obtain the private information of Plaintiff and Class Members.

262. Defendant's conduct was a substantial factor in causing the harm to Plaintiff and Class Members.

-40-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

263.    Defendant used its apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets in order to eavesdrop on the private conversations of Plaintiff and Class Members and to obtain their browser search history, browsers' metadata, cookies and commands, for the purpose of profiting and unjustly enriching itself of its targeted advertising business.

264.    Defendant impermissibly and illegally engaged in such conduct even though it is not any of the following:

      A.  A public utility, or telephone company, engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility or telephone company;

      B.  A user of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility; nor

      C.  A telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

265.    In accordance with Cal. Penal Code § 637.2, Plaintiff and the Class Members seek to enjoin and restrain Defendant's violation of this chapter and seek the greater of the following amounts, either five thousand dollars ($5,000) per violation by Defendant or three times the amount of actual damages, if any, sustained by Plaintiff and Class Members, along with attorneys' fees and costs.

**COUNT V - California Invasion of Privacy Act, Cal. Penal Code § 632**

266.    Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

267.    Plaintiff brings this claim individually and on behalf of members of the California Subclass against Defendant Meta Products, Inc.

-41-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

268.    Plaintiff and Class Members have a private right of action under Cal. Penal Code § 632 via Cal. Penal Code § 637.2.

269.    Defendant is a "person" under Cal. Penal Code § 632 as it is a corporation.

270.    Defendant is not an individual known by all parties to a confidential communication to be overhearing or recording the communications at issue.

271.    Defendant, via its Defendant's apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets, violated the privacy of Plaintiff and Class Members.

272.    Defendant intentionally, and/or with purpose or desire of recording confidential conversation, eavesdropped on/recorded the confidential conversations of Plaintiff and Class Members by using an electronic device.

273.    Defendant knew to a substantial certainty that its Defendant's apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets, would eavesdrop on/record the conversations of Plaintiff and Class Members with websites.

274.    Plaintiff and Class Members had a reasonable expectation that the conversation was not being overheard or recorded.

275.    Because Defendant's native Android apps silently listened on fixed local ports for tracking purposes, receiving browsers' metadata, cookies and commands, Plaintiff and the Class Members reasonably did not know that their confidential communications were being recorded by Defendant.

276.    Plaintiff and Class Members also had an objectively reasonable expectation that the conversation was confidential and was not being overheard or recorded, particularly when Defendant's web-to-app ID sharing method bypasses typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls.

277.    Defendant's Meta Pixel JavaScripts loaded on Plaintiff and Class Member mobile browsers silently connected with native apps running on the Plaintiff and Class Member devices through localhost sockets, allowing Defendant to obtain and/or link private mobile browsing

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

sessions and web cookies to user identities, de-anonymizing users' visiting sites embedding Defendant's scripts, without consent of any party to the communication, let alone consent from Plaintiff and the Class Members.

278. Defendant did not have the consent of all parties to the conversation to eavesdrop on/record it.

279. Plaintiff and Class Members were harmed.

280. Defendant's conduct was a substantial factor in causing the harm to Plaintiff and Class Members.

281. The communications at issue here were "confidential communication" because they were communications carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto.

282. As they occurred on the Android devices of Plaintiff and Class Members, the communications at issue were not made in a public gathering, nor in any legislative, judicial, executive, or administrative proceeding open to the public, let alone in such circumstances in which the parties to the communication reasonably expected that the communication may be overheard or recorded.

283. Defendant impermissibly and illegally engaged in such conduct even though it is not any of the following:

    A. A public utility, or telephone company, engaged in the business of providing communications services and facilities, or to the officers, employees or agents thereof, where the acts otherwise prohibited herein are for the purpose of construction, maintenance, conduct or operation of the services and facilities of the public utility or telephone company;

    B. A user of any instrument, equipment, facility, or service furnished and used pursuant to the tariffs of a public utility; nor

    C. A telephonic communication system used for communication exclusively within a state, county, city and county, or city correctional facility.

-43-

CLASS ACTION COMPLAINT

Case No. _____

284.    Plaintiff and Class Members have been injured by Defendant's actions in violation of Cal. Penal Code § 632, which is traceable to Defendant's development and use of Defendant's eavesdropping devices (i.e., its apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets) to obtain the private information of Plaintiff and Class Members.

285.    Defendant's conduct was a substantial factor in causing the harm to Plaintiff and Class Members.

286.    Defendant used its apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets in order to eavesdrop on the private conversations of Plaintiff and Class Members and to obtain their browser search history, browsers' metadata, cookies and commands, for the purpose of profiting and unjustly enriching itself of its targeted advertising business.

287.    In accordance with Cal. Penal Code § 637.2, Plaintiff and the Class Members seek to enjoin and restrain Defendant's violation of this chapter and seek the greater of the following amounts, either five thousand dollars ($5,000) per violation by Defendant or three times the amount of actual damages, if any, sustained by Plaintiff and Class Members, along with attorneys' fees and costs.

**COUNT VI – California Invasion of Privacy Act, Cal. Penal Code § 635**

288.    Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

289.    Plaintiff brings this claim individually and on behalf of members of the California Subclass against Defendant Meta Products, Inc.

290.    Plaintiff and Class Members have a private right of action under Cal. Penal Code § 635 via Cal. Penal Code § 637.2.

291.    At all times relevant, Defendant, via its Defendant's apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets, was a "person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports,

-44-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another… ." Cal. Penal Code § 635.

292.    Defendant impermissibly and illegally engaged in such conduct even though it is not any of the following:

    A.  A communication utility or an officer, employee or agent thereof for the purpose of construction, maintenance, conduct, or operation of, or otherwise incident to the use of, the services or facilities of the utility;

    B.  A state, county, or municipal law enforcement agency or an agency of the federal government;

    C.  A person engaged in selling devices specified in Cal. Penal Code § 635(a) for use by, or resale to, agencies of a foreign government under terms approved by the federal government, communication utilities, state, county, or municipal law enforcement agencies, or agencies of the federal government; nor

    D.  A subscriber to communication utility service of a device specified in Cal. Penal Code § 635(a) furnished by the utility pursuant to its tariffs.

293.    Defendant's Meta Pixel JavaScripts loaded on Plaintiff and Class Member mobile browsers silently connected with native apps running on the Plaintiff and Class Member devices through localhost sockets, allowing Defendant to obtain and/or link private mobile browsing sessions and web cookies to user identities, de-anonymizing users' visiting sites embedding Defendant's scripts, without consent of any party to the communication, let alone consent from Plaintiff and the Class Members.

294.    Plaintiff and Class Members have been injured by Defendant's actions in violation of Cal. Penal Code § 635, which is traceable to Defendant's development and use of Defendant's eavesdropping devices (i.e., its apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets) to obtain the private information of Plaintiff and Class Members.

-45-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

295.   Defendant's conduct was a substantial factor in causing the harm to Plaintiff and Class Members.

296.   Defendant used its apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets in order to eavesdrop on the private conversations of Plaintiff and Class Members and to obtain their browser search history, browsers' metadata, cookies and commands, for the purpose of profiting and unjustly enriching itself of its targeted advertising business.

297.   In accordance with Cal. Penal Code § 637.2, Plaintiff and the Class Members seek to enjoin and restrain Defendant's violation of this chapter and seek the greater of the following amounts, either five thousand dollars ($5,000) per violation by Defendant or three times the amount of actual damages, if any, sustained by Plaintiff and Class Members, along with attorneys' fees and costs.

**COUNT VII - California Invasion of Privacy Act, Cal. Penal Code § 638.51**

298.   Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

299.   Plaintiff brings this claim individually and on behalf of members of the California Subclass.

300.   Plaintiff and Class Members have a private right of action under Cal. Penal Code § 638.51 via Cal. Penal Code § 637.2.

301.   Defendant is a person within the meaning of the statute.

302.   A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

303.   Pen registers can take the form of software, as such, Defendant's native apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets, are

-46-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

a device or at a minimum reflect a process that Defendant used to identifies consumers, gather data and correlate that data.

304.    Moreover, Defendant's pen register at issue here is not a device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider, or a device or process used by a provider or customer of a wire communication service for cost accounting or other similar purposes in the ordinary course of its business.

305.    Defendant used its pen register to collect dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted. *See* Cal. Penal Code § 538.50(b).

306.    Defendant is not a provider of electronic or wire communication service, nor did it use a pen register or a trap and trace device (1) to operate, maintain, and test a wire or electronic communication service, (2) to protect the rights or property of the provider, or (3) to protect users of the service from abuse of service or unlawful use of service, (4) to record the fact that a wire or electronic communication was initiated or completed to protect the provider, another provider furnishing service toward the completion of the wire communication, or a user of that service, from fraudulent, unlawful, or abusive use of service, or (5) if the consent of the user of that service has been obtained.

307.    Defendant also acted without first obtaining a court order pursuant to Cal. Penal Code § 638.52 or 638.53.

308.    Plaintiff and Class Members are website users and did not consent to Defendant's collection of their information.

309.    Indeed, Defendant's Meta Pixel JavaScripts loaded on Plaintiff and Class Member mobile browsers silently connected with native apps running on the Plaintiff and Class Member devices through localhost sockets, allowing Defendant to obtain and/or link private mobile browsing sessions and web cookies to user identities, de-anonymizing users' visiting sites

-47-

embedding Defendant's scripts, without consent of any party to the communication, let alone consent from Plaintiff and the Class Members.

310.   Plaintiff and Class Members have been injured by Defendant's actions in violation of Cal. Penal Code § 638.50, which is traceable to Defendant's development and use of Defendant's pen register (i.e., its apps, Meta Pixel software and exploitation and misuse of the unvetted access to localhost sockets) to identify Plaintiff and Class Members, gather data and correlate that data.

311.   Defendant's conduct was a substantial factor in causing the harm to Plaintiff and Class Members.

312.   Defendant used a pen register for the purpose of profiting and unjustly enriching itself of its targeted advertising business.

313.   In accordance with Cal. Penal Code § 637.2, Plaintiff and the Class Members seek to enjoin and restrain Defendant's violation of this chapter and seek the greater of the following amounts, either five thousand dollars ($5,000) per violation by Defendant or three times the amount of actual damages, if any, sustained by Plaintiff and Class Members, along with attorneys' fees and costs.

### COUNT VIII - Breach of Contract

314.   Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

315.   Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendant Meta Products, Inc.

316.   A valid contract exists between Meta and Plaintiff and Class members. *See generally* https://mbasic.facebook.com/legal/terms/plain_text_terms/ (last visited June 11, 2025).

317.   The contract specifies that California law governs the parties' relationship.

318.   Meta breached the parties contract via its interception of the content of the personal and individually identifiable personal information conducted on their Android devices.

-48-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

319. In doing so, Meta breached the contract by exceeding the permissions granted to Meta to provide services. While Meta needs certain permissions from users to provide its services, Terms of Service Section 3.3., Meta received no consent or permission from Plaintiff and Class members to utilize or employ a web-to-app ID sharing method that bypasses typical privacy protections such as clearing cookies, Incognito Mode and Android's permission controls.

320. Furthermore, Defendant breached its contract by failing to take "appropriate action" i.e., "[i]f we learn of content or conduct like [potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community] we may take appropriate action based on our assessment that may include - notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement." Based on Meta's other statements, "appropriate action" for its unauthorized data collection complained of here should have included never implementing a web-to-app ID sharing method that bypasses typical privacy protections such as clearing cookies, Incognito Mode and Android's permission controls. Yet, Meta took no such action until caught by security researchers in June 2025 and in fact made multiple changes to its coding to ensure continued web-to-app ID sharing.

321. Plaintiff and Class Members were damaged by Defendant's breach of contract.

322. As a direct and proximate results of Meta's breach of contract, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services from Meta that were less valuable than described in their contract with Meta. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Meta's partial, deficient, and/or defective performance.

323. Meta's breach caused Plaintiff and Class members the following damages:

    A. Nominal damages;

    B. The interruption or preclusion of Plaintiff's and Class members' ability to privately communicate with websites;

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

C. The diminution in value of Plaintiff's and Class members' private information;

D. The inability to use their computing devices for the purpose of privately communicating with websites;

E. The loss of privacy due to Meta making private information that Plaintiff and Class members intended to remain private no longer private;

F. Meta took something of value from Plaintiff and Class members and derived benefits therefrom without Plaintiff's and Class members' knowledge or informed consent and without Meta sharing the benefit of such value;

G. The deprivation of the benefit of the bargain in that Meta's contract stated that the data license for its services did not include or permit web-to-app ID sharing method that bypasses typical privacy protections; and

H. Plaintiff and Class Members suffered an invasion of privacy.

324. Plaintiff and Class Members seek compensatory damages for the invasion of their privacy.

325. For Meta's breaches, Plaintiff and Class members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

## COUNT IX - Breach of Duty of Good Faith and Fair Dealing

326. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

327. Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendant Meta Products, Inc.

328. A valid contract exists between Meta and Plaintiff and Class Members. *See generally* https://mbasic.facebook.com/legal/terms/plain_text_terms/ (last visited June 11, 2025).

329. The contract specifies that California law governs the parties' relationship.

-50-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

330.    Meta prevented Plaintiff and Class Members from receiving the full benefit of the contract by surreptitiously, and without permission, intercepting the content of their individually identifiable personal information.

331.    In doing so, Meta abused its power to define terms of the contract, including:

A.    Overreaching on the permissions granted to Meta to provide services. While Meta needs certain permissions from users to provide its services, Terms of Service Section 3.3., Meta received no consent or permission from Plaintiff and Class Members to utilize or employ a web-to-app ID sharing method that bypasses typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls.

B.    The meaning of the term "appropriate action" in the promise "[i]f we learn of content or conduct like [potential misuse of our Products, harmful conduct towards others, and situations where we may be able to help support or protect our community] we may take appropriate action based on our assessment that may include - notifying you, offering help, removing content, removing or restricting access to certain features, disabling an account, or contacting law enforcement." Based on Meta's other statements, "appropriate action" for its unauthorized data collection complained of here should have included never implementing a web-to-app ID sharing method that bypasses typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls. Yet, Meta took no such action until caught by security researchers in June 2025 and in fact made multiple changes to its coding to ensure continued web-to-app ID sharing.

332.    Meta did not act fairly and in good faith.

333.    Rather than receiving permission to utilize web-to-app ID tracking which circumvented otherwise present Android privacy protections, Meta actively gathered such information, without the contractual right or permission to do so.

-51-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

334.    Rather than taking "appropriate action" upon discovering that private information was being collected by Meta through the implementation of a web-to-app ID sharing method that bypasses typical privacy protections without the right to do so, Meta actively solicited such information in order to further obtain advertising revenue.

335.    In doing so, Meta frustrated and undercut Plaintiff's and Class Members' contractual rights, and unfairly interfered with Plaintiff's and Class Members' rights under the parties' contract.

336.    As a direct and proximate results of Meta's breach of contract, Plaintiff and Class Members did not receive the full benefit of the bargain, and instead received services from Meta that were less valuable than described in their contract with Meta. Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Meta's partial, deficient, and/or defective performance.

337.    Meta's breach caused Plaintiff and Class Members the following damages:

   A. Nominal damages;

   B. The interruption or preclusion of Plaintiff's and Class Members' ability to privately communicate with websites;

   C. The diminution in value of Plaintiff's and Class Members' private information;

   D. The inability to use their computing devices for the purpose of privately communicating with websites;

   E. The loss of privacy due to Meta making private information that Plaintiff and Class Members intended to remain private no longer private;

   F. Meta took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without Meta sharing the benefit of such value;

-52-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

G.  The deprivation of the benefit of the bargain in that Meta's contract stated that the data license for its services did not include or permit web-to-app ID sharing method that bypasses typical privacy protections; and

H.  Plaintiff and Class Members suffered an invasion of privacy.

338.  Plaintiff and Class Members seek compensatory damages for the invasion of their privacy.

339.  For Meta's breaches, Plaintiff and Class Members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

## COUNT X- Restitution Based on Quasi-Contract

340.  Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

341.  Plaintiff brings this claim for relief in the alternative in accordance with Fed. R. Civ. P. 8(a)(3).

342.  Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendant Meta Products, Inc.

343.  First, Defendant received a benefit.

344.  Plaintiff and Class Members typically private browsing history and browsers' metadata, cookies and commands is valuable both in the marketplace generally and to Defendant specifically.

345.  Plaintiff and Class Members conferred a monetary benefit on Defendant by providing (without their authorization or consent) Defendant with their valuable private information and data.

346.  Defendant then used and/or sold (and continues to use and/or sell) that valuable private information and data in order to sell targeted advertising under its business model of providing advertising services to non-party businesses, thereby generating revenue and profit.

-53-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

347. However, Defendant's retention of that benefit, revenue and/or profit at the expense of Plaintiff and the Class Members would be unjust.

348. Here, Defendant misused the unvetted access to localhost sockets in order to silently listen on local ports for tracking purposes, effectively allowing it to link mobile browsing sessions and web cookies to user identities, de-anonymizing users' visiting sites embedding their scripts. Defendant's web-to-app tracking scheme also bypassed typical privacy protections such as clearing cookies, Incognito mode and Android's permission controls. And the scheme circumvented fundamental security principles known as sandboxing, with Defendant using its scheme to break the sandbox that exists between the mobile context and the web context, allowing the Android system to communicate what happens in the browser with the identity running in the mobile app.

349. On top of this, Defendant's behavior circumvented the terms of service for Google's Play marketplace and the privacy expectations of Android users.

350. Thus, under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because of Defendant's implementation of its covert web-to-app tracking scheme.

351. Plaintiff retain a stake in Defendant's profits garnered from their personal browsing histories and other personal information obtain by Defendant via its covert web-to-app tracking scheme because the circumstances are such that, as between the Plaintiff/Class Members and Defendant it would be unjust for Defendant to retain it.

352. As a result, Plaintiff seek a disgorgement of Defendant's unjustly earned profits resulting from Defendant's unjust enrichment.

353. Plaintiff and the Class Members seek equitable relief because any remedies at law are inadequate.

354. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

-54-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

355. Plaintiff and Class Members are entitled to restitution, compensatory, consequential, or nominal damages suffered as a result of Defendant's unjust scheme.

356. Moreover, Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

**COUNT XI- Breach of Third-Party Beneficiary Contract**

357. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

358. Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendants Meta Products, Inc. and Google, LLC.

359. Meta developed multiple apps, including Facebook and Instagram among other apps, and with Google, made the same publicly available on Android devices via Google's Google Play store.

360. Meta and Google entered into one or more contracts for Meta's apps to become publicly available on Android devices and the Google Play store, particularly the Google Play Developer Distribution Agreement. *See* https://play.google/developer-distribution-agreement.html (last visited June 13, 2025).

361. Such contracts were made expressly for the benefit of Plaintiff and Class Members, as under Section 4.8 of the Google Play Developer Distribution Agreement, Defendant "agree[d] that if You make Your Products available through Google Play, You will protect the privacy and legal rights of users."

362. Thus, the protection of the privacy rights belonging to Plaintiff and Class Members was the direct and primary objective of the contracting parties and Plaintiff and Class Members were direct and express beneficiaries of such contracts.

363. Defendants knew or should have known that if they were to breach such contracts with users, Plaintiff and Class Members would be harmed.

-55-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

364.   Meta breached the Google Play Developer Distribution Agreement, among other things, by violating the privacy rights of Plaintiff and Class Members via its use of its covert web-to-app tracking scheme detailed herein.

365.   Google breached the Google Play Developer Distribution Agreement, among other things, by violating the privacy rights of Plaintiff and Class Members by permitting Meta to violate the privacy rights of Plaintiff and Class Members via its use of its covert web-to-app tracking scheme detailed herein.

366.   Google has publicly recognized that Meta's behavior violates the terms of service for its Google Play marketplace and the privacy expectations of Android users.

367.   As a direct and proximate results of the breach of contract, Plaintiff and Class Members did not receive the full benefit of the bargain as beneficiaries, and instead received services from Meta that were less valuable than described in the Meta-Google contract.

368.   Plaintiff and Class Members, therefore, were damaged in an amount at least equal to the difference in value between that which was promised and Defendants' partial, deficient, and/or defective performance.

369.   Defendants' breach caused Plaintiff and Class Members the following damages:

    A.  Nominal damages;

    B.  The interruption or preclusion of Plaintiff's and Class Members' ability to privately communicate with websites;

    C.  The diminution in value of Plaintiff's and Class Members' private information;

    D.  The inability to use their computing devices for the purpose of privately communicating with websites;

    E.  The loss of privacy due to Meta making private information that Plaintiff and Class Members intended to remain private no longer private;

-56-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

F. Meta took something of value from Plaintiff and Class Members and derived benefits therefrom without Plaintiff's and Class Members' knowledge or informed consent and without Meta sharing the benefit of such value;

G. The deprivation of the benefit of the bargain in that the Meta-Google contract stated that the data license for its services did not include or permit web-to-app ID sharing method that bypasses typical privacy protections; and

H. Plaintiff and Class Members suffered an invasion of privacy.

370. Plaintiff and Class Members seek compensatory damages for the invasion of their privacy.

371. For Defendants' breaches, Plaintiff and Class Members seek nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, restitution, and any other relief the Court deems just.

## COUNT XII– Negligence

372. Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

373. Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendant Google, LLC.

374. Google's Android mobile operating system and Google's Chrome web browser require their users, like Plaintiff and Class Members, to submit non-public private information as a condition of becoming a customer and using such operating system, software and related services provided by the same.

375. Through its relationships with these entities, Google facilitated the transfer and storage of the private information of Plaintiff Class Members as part of its business, which affects commerce.

376. As users of Google's operating system and software, Plaintiff and Class Members sent and/or continue to send new private information as they continue to receive services or conduct business with Google.

-57-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

377. Plaintiff and Class Members entrusted Google with their private information with the reasonable understanding that the same would be safeguarded and protected against unauthorized disclosure.

378. Google had full knowledge of the high monetary value and sensitivity of Plaintiff's and Class Members' private information and the types of harm that Plaintiff and Class Members could and would suffer if their private was wrongfully disclosed.

379. By assuming developing and making publicly available its Android operating system and Chrome web browser in order to derive business value and commercial profits, Google assumed a duty under common law to Plaintiff and Class Members to exercise reasonable care to ensure that its Android operating system and Chrome web browser would be secure and safeguard their private information and keep it from being compromised, accessed, and misused by unauthorized persons or entitles, like Meta.

380. Google owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and to ensure that its operating system and software adequately protected private information.

381. Google's duty to use reasonable care arose from several sources, including, but not limited to, those described below.

382. Google holds itself out as a trusted provider of operating system and web browser software. Its duty to develop software that included reasonable security measures arose as a result of the special relationship that existed between Google, on the one hand, and Plaintiff and Class Members on the other hand. That special relationship arose because of Google's business as the developer of the Android operating system and Chrome web browser, which required Plaintiff and Class Members to provide and entrust Defendant with their confidential private information.

383. Thus, Google was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Meta's web-to-app data access scheme.

-58-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

384. Google owed a duty to Plaintiff and Class Members to develop and maintain an operating system and software that employed reasonable data security measures to protect the private information its customers collected, stored, and used on its Android operating system and Chrome web browser.

385. The risk that unauthorized persons would attempt to gain access to Plaintiff's and Class Members' private information was foreseeable to Google. It had a common law duty to prevent foreseeable harm to others because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Google. By selling and/or making available Android operating system and Chrome web browser whose function is collecting, receiving, storing, and using private information that is routinely targeted by criminals for unauthorized access, Google was obligated to act with reasonable care to protect against these foreseeable threats.

386. Given that Google's Android operating system and Chrome web browser enables Google's customers to collect, store, and use vast amounts of private information and the high market value of this data, it was inevitable that unauthorized individuals would at some point try to hack into or manipulate the Android operating system and Chrome web browser. Google knew, or should have known, the importance of exercising reasonable care in developing, monitoring, managing, and updating its Android operating system and Chrome web browser.

387. Because Google's business pertains to private information, Google, via its Privacy & Terms policy as well as its Google Play Developer Distribution Agreement, acknowledge its legal obligations as well as its duty to protect and prevent from disclosure all other data collected and stored on its Android operating system and Chrome web browser.

388. Google had a duty to promptly and adequately notify Plaintiff and Class Members about the Meta's access to their private information, but failed to do so, and breached this duty.

389. Google had and continues to have duties to adequately disclose that Plaintiff's and Class Members' private information might have been compromised, how it was compromised, and precisely the types of data that were compromised and when.

-59-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

390.    Such notice was and continues to be necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their private information by Meta.

391.    Google breached its duties owed to Plaintiff and Class Members and thus was negligent. Google breached these duties by, among other things: (a) mismanaging its Android operating system and Chrome web browser development and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of said software, which resulted in the unauthorized access and compromise of private information; (b) mishandling its data privacy and security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to detect Meta's data access and/or breach at the time it began or within a reasonable time thereafter; and (f) failing to follow its own policies and practices published to its clients.

392.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the data attack and harms suffered.

**COUNT XIII- Declaratory Judgment, 28 U.S.C. §§ 2201, et seq.**

393.    Plaintiff realleges and incorporates by reference each allegation in the preceding and succeeding paragraphs.

394.    Plaintiff brings this claim individually and on behalf of members of the Nationwide Class against Defendant Meta Products, Inc.

395.    Plaintiff and Class Members repeat and re-allege each and every allegation as if fully set forth herein.

396.    Plaintiff pursues this claim under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

-60-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

397.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief.

398.    Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

399.    An actual controversy has arisen in the wake of the Defendant's covert web-to-app tracking scheme to acquire the private and personal information of Plaintiff and the Class Members without their permission or consent and use the same for purposes of Defendant's business of targeted advertising.

400.    Plaintiff and the Class remain at imminent risk that Defendant will continue to collect and or use such data for targeted advertising in the future.

401.    The Court should also issue prospective injunctive relief requiring Defendant to employ adequate practices to completely stop the employment of acquiring the private data of Plaintiff and the Class Members via Defendant's covert web-to-app tracking scheme and Defendant's use of the data collected as a result of this scheme.

402.    Defendants still control the Private Information of Plaintiff and the Class Members.

403.    Defendant appears to have partially halted the practice following public disclosure of the scheme since, as of June 3rd 7:45 CEST, Meta/Facebook Pixel script is no longer sending any packets or requests to localhost, with the code responsible for sending the _fbp cookie has been almost completely removed, but not completely removed.  Moreover, Defendant continues to use the data of Plaintiff and Class Members obtained as a result of its scheme.

404.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy as a result of Defendant's unauthorized and continued use of the private data of Plaintiff and Class Members.

405.    The risk of such continued use is real, immediate, and substantial.

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

406. As described above, actual harm has arisen in the wake of the Defendant's tracking scheme, Defendant's contractual obligations and duties of care to protect the privacy rights of Plaintiff and Class Members.

407. Further, Plaintiff and Class members are at risk of additional or further harm due to Defendant's continued retention and use of their private information to further its advertising business.

408. Moreover, security researchers have noted that while technological remedies that have been put in place "are working as intended…they could become ineffective at any time."[52]

409. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, Defendants will continue to use the personal, private data of Plaintiff and Class Members, data that it should never have received in the first place. On the other hand, the cost to Defendant of complying with an injunction by halting the collection practices described of herein and disgorging the data it obtained without consent, permission and legal violation is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

410. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public preventing further employment of an impermissible covert data malware scheme and the use of the data obtained as a result of the same, thus eliminating the additional injuries that would result to Plaintiff and Class Members.

411. Plaintiff and Class Members seek a declaration (i) that Defendant's covert web-to-app tracking scheme violated the privacy rights of Plaintiff and Class Members; and (ii) that to comply with their duty to protect the privacy rights of Plaintiff and Class Members, Defendant must disgorge the data it obtained without consent, permission and in violation of the law.

## PRAYER FOR RELIEF

412. Plaintiff, individually and on behalf of the Nationwide Class and/or California Subclass, respectfully request that the Court grant the following relief:

---

[52] https://arstechnica.com/security/2025/06/meta-and-yandex-are-de-anonymizing-android-users-web-browsing-identifiers/

-62-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

A.  Certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as Class Representative and undersigned counsel as Class Counsel;

B.  Find in favor of Plaintiff and the Classes on all counts asserted herein;

C.  Award Plaintiff and the Classes actual, statutory, and/or punitive monetary damages to the maximum extent as allowed by law;

D.  Award Plaintiff and the Classes compensatory, consequential, general, and/or nominal monetary damages in an amount to be proven at trial;

E.  Award Plaintiff and the Classes restitution and all other applicable forms of equitable monetary relief;

F.  Award Plaintiff and the Classes equitable relief by enjoining Defendant from engaging in the wrongful conduct complained of herein regarding the misuse of the private information of Plaintiff and Class Members;

G.  Award Plaintiff and the Classes injunctive relief as permitted by law or equity to assure that they have an effective remedy, and to protect the interests of Plaintiff and Class Members;

H.  Award disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts;

I.   Order Defendant to pay all costs necessary to notice Class Members about the judgment and all costs necessary to administer a court approved claims process.

J.   Award Plaintiff and the Classes pre-judgment and post-judgment interest to the maximum extent allowed by law;

K.  Grant Plaintiff and the Classes leave to amend this complaint to conform to the evidence produced during the course of this case;

L.  Award Plaintiff and the Classes reasonable attorneys' fees, costs, and expenses, as allowable;

-63-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

M.  Where necessary, distribute any monies recovered from Defendant on behalf of Class Members or the general public via fluid recovery or cy pres recovery as applicable to prevent Defendant from retaining benefits of its wrongful conduct;

N.  Award Plaintiff and the Class such other favorable relief as allowable under law or at equity;

O.  Award any other and further relief as may be just and proper; and

P.  Conduct a trial by jury on all issues so triable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

-64-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1

DATED: July 3, 2025

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:    */s/ Shana E. Scarlett*
Shana E. Scarlett (217895)
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue, Suite 300
Berkeley, California 94710
T: (510) 725-3000
shanas@hbsslaw.com

Daniel J. Kurowski (*pro hac vice* forthcoming)
Whitney K. Siehl (*pro hac vice* forthcoming)
455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
T: (708) 628-4949
dank@hbsslaw.com
whitneys@hbsslaw.com

*Attorneys for Plaintiff*

-65-

CLASS ACTION COMPLAINT

Case No. _____

004453-12/3205319 V1